In the Matter of LONG DEVELOPMENT, INC., Debtor.

OFFICIAL UNSECURED CREDITORS COMMITTEE OF LONG DEVELOPMENT, INC., Plaintiff,

v.

OAK PARK VILLAGE LIMITED PARTNERSHIP and Oak Park Village No. 2 Limited Partnership, jointly and severally, Defendants.

Bankruptcy No. 91–84522.
Adversary No. 93–8216.

United States Bankruptcy Court, W.D. Michigan.

Aug. 22, 1994.

Gary H. Cunningham, Bloomfield Hills, MI, for Plaintiff Official Unsecured Creditors Committee of Long Development, Inc.

Ronald R. Sutton, Lansing, MI, for Defendants Oak Park Village Limited Partnership and Oak Park Village No. 2 Limited Partnership.

*OPINION REGARDING PARTIAL ASSIGNMENT OF DEBTOR'S INTEREST IN PROMISSORY (WRAP) NOTES*

JAMES D. GREGG, Bankruptcy Judge.

### I. ISSUES

Among other things, this adversary proceeding raises the following issues. First, does the Official Unsecured Creditors Committee (the "Committee") have standing to bring this adversary proceeding against Oak Park Village Limited Partnership and Oak Park Village No. 2 Limited Partnership (the "Defendants" or the "Partnerships")? Second Pretrial Order, Docket # 34, "Issues" at ¶ 15. Second, did Long Development, Inc. (the "Debtor"), pursuant to the Assignment of Ownership Interest in Wrap Note Payments (the "Assignment"), assign an ownership interest or merely grant a security interest in the Wrap–Around Promissory Notes (the "Wrap Notes")? Id. at ¶ 1; *see* Joint Exhibits B and F. Third, if the Debtor merely granted a security interest in the Wrap Notes, did the Defendants properly perfect their security interest in those Notes? Second Pretrial Order, Docket # 34, "Issues" at ¶ 12.

The court concludes that the Committee has standing to pursue this adversary proceeding. In addition, the court finds that the Debtor validly assigned an ownership interest in a portion of the Wrap Notes. Because the Debtor did not grant a security interest in the Wrap Notes, the court need not reach the perfection issue raised by the Committee.

### II. JURISDICTION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A), (K), and (0). To the extent this matter may be a noncore, related proceeding, all parties have consented, pursuant to 28 U.S.C. § 157(c)(2), to this court hearing the proceeding and rendering a final judgment or order subject to appellate review pursuant to 28 U.S.C. § 158. See Stipulation and Order Re Jurisdiction, Docket # 32; Second Pretrial Order, Docket # 34. The following constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## III. FACTS AND PROCEDURAL BACKGROUND

The controversy underlying this adversary proceeding began more than ten years ago with the sale of the Oak Park Village Apartments (the "Apartments") to the Debtor. The Partnerships, of which Gordon Long ("Long") was the general partner at the time of the sale to the Debtor, developed and operated the Apartments. See First Amended Complaint (the "Amended Complaint"), ¶ 5 at 2, ¶ 9B and 9C at 3; Defendant's [sic] Answer to Plaintiff's First Amended Complaint (the "Answer"), ¶ 5 at 2, ¶ 9 at 3; see also Trial Brief of the Defendants Oak Park Village Limited Partnership and Oak Park Village No. 2 Limited Partnership ("Defendants' Brief") at 2. On August 30, 1983, the Partnerships, through their general partner Long, sold the Apartments to the Debtor for $14,913,951.80.[1] Plaintiff's Trial Brief on Issues of: (1) Assignment, (2) Perfection and (3) Avoidance ("Plaintiff's Brief") at 2–3; Defendants' Brief at 2; Joint Exhibit R12. Long was the majority shareholder and president of the Debtor. Amended Complaint, ¶ 9A at 3; Answer, ¶ 9 at 3; Defendants' Brief at 2. Of the $14,913,951.80 purchase price, $11,913,951.80 was allocated to the Debtor's assumption of mortgages on the Apartments.

1. Joint Exhibit R12 states the sale price as $14,913,951.80. In its brief, the Committee rounded this figure off to $14,913,952.00, no doubt for the sake of convenience.

2. The Committee rounded this figure off to $1,692,111.00. See supra note 1.

3. In their brief, the Partnerships state that "[w]hile the Oak Park Partnerships received a lump-sum payment of approximately $2.7 million

Joint Exhibit R12. The Debtor agreed to pay the $3 million balance in cash to the Partnerships, which received more than $2.7 million in cash after deduction of closing costs. Plaintiff's Brief at 3; Defendants' Brief at 2.

The Debtor then turned around on *the same day*, August 30, 1983, and sold the Apartments to Oak Park–Oxford Associates Limited Partnerships ("Oxford"). In consideration for its sale of the Apartments to Oxford, the Debtor received $1,692,111.06[2] in cash and two Wrap Notes in the principal amounts of $10,650,000 and $4,350,000. See Joint Exhibits B, § 2, § 3; Plaintiff's Brief at 3.

On September 27, 1984, the Partnerships filed suit against Long and the Debtor in Clinton County Circuit Court (the "state court litigation"). The Partnerships alleged that Long had breached his fiduciary duties to the Partnerships' limited partners by failing to inform them of the "far superior opportunity presented by the sale of [the Apartments] to Oak Park–Oxford Associates Limited Partnership...." Joint Exhibit K at 8. The Partnerships claimed that the price paid to the Debtor by Oxford exceeded by approximately $5.8 million the price that the Debtor had paid to the Partnerships for the Apartments.[3] Joint Exhibit K at 8–9. In effect, it was alleged in the state court litigation that the Debtor and Long had stolen a profit that belonged to the Partnerships.

On December 21, 1987, the Clinton County Circuit Court granted summary disposition against Long and the Debtor on the issue of liability. The court held "as a matter of law that Defendant Long did breach his fiduciary duty to Plaintiffs by not advising them of the interest of the Oxford Group in the Partnership Property." Joint Exhibit P. The court

at closing, [the Debtor] would receive from Oxford nearly a $1.7 million lump-sum payment at closing and future additional payments of nearly $9 million." Defendants' Brief at 2. The court sees no need to determine the exact difference received in the two sales of the Apartments; the state court found the Debtor and Long liable to the Partnerships, and the amount of that liability is provided for by the terms of the Release and Settlement Agreement.

See Joint Exhibits E and P.

further ordered that a trial be held as to the amount of damages Long and the Debtor owed to the Partnerships.

Prior to trial, the parties to the state court litigation settled the damages issue. Under the terms of the Release and Settlement Agreement (the "Settlement Agreement"), executed on December 7, 1988, the Debtor agreed to make the following cash payments to the Partnerships: (1) $50,000 by December 20, 1988; (2) $50,000 by January 15, 1989; and (3) $150,000 by April 1, 1989. Joint Exhibit E, ¶ 1 at 2. Second, the Debtor agreed to "assign a portion of its right, title and interest in and to the Wrap Notes. ...." *Id.* ¶ 2 at 3. Finally, Long agreed to guarantee the obligations assumed by the Debtor under the terms of the Settlement Agreement. *Id.*, ¶ 3 at 5. In exchange for these payments, the Partnerships agreed to dismiss the lawsuit against Long and the Debtor. *Id.*, ¶ 6 at 10. In addition, except as provided for by the Settlement Agreement, the Partnerships agreed to release and discharge Long and the Debtor from all claims and causes of action "which were known or should have been known by the parties relating in any manner to or arising from or which could have arisen from the Lawsuit...." *Id.*, ¶ 10 at 12.

Also on December 7, 1988, the Debtor and the Partnerships entered into the Assignment. Joint Exhibit F. In order to carry out the terms of the Settlement Agreement, the Debtor assigned to the Partnerships a portion of the future payments due under paragraphs (b)(iii)(B) and (c) of the Wrap Notes. Id. at 2.

On August 22, 1991, the Debtor filed for relief under chapter 11 of the Bankruptcy Code. On April 6, 1993, the Committee filed the instant adversary proceeding, essentially claiming that the portion of the Wrap Note payments transferred to the Partnerships under the terms of the Assignment were property of the Debtor's estate under 11 U.S.C. § 541. *See* Amended Complaint. The Committee asserted that, at best, the Debtor had merely granted a security inter-

est in the Wrap Note payments to the Partnerships and that the Partnerships had failed to properly perfect their security interest in those Wrap Note payments. *Id.*

This court held a trial on the assignment and perfection issues on May 19, 1994.[4] The Committee and the Partnerships submitted Joint Exhibits A through W into evidence. In addition, three witnesses testified on behalf of the Committee: (1) Jeffrey Dale Kegler, the vice president and controller of the Debtor; (2) Wendy Zabriskie, who previously worked as a commercial loan officer for Michigan National Bank ("MNB"), the collection agent for the Wrap Notes; and (3) Jay Hansen, an employee of Independence One Mortgage Corporation, a wholly owned subsidiary of MNB. *See* Transcript of May 19, 1994 trial ("Transcript"). After a day-long trial, the court took the matter under advisement.

## IV. STANDING

The Partnerships raise as an affirmative defense the issue of the Committee's standing to bring this adversary proceeding. Answer at 13; Defendants' Brief at 5–7. In *In the Matter of Lansing Clarion Ltd. Partnership*, 132 B.R. 845 (Bankr.W.D.Mich.1991), this court enunciated the requirements a party must satisfy in order to establish standing.

> Standing generally exists if a party can demonstrate three elements: (1) an actual or threatened injury resulting from the conduct of the opposing party; (2) the injury can be traced to the challenged action; and (3) the injury is likely to be redressed by a favorable decision by the court.

*Id.* at 848 (citations omitted).

 The Committee satisfies these requirements for standing because a resolution of this adversary proceeding that is favorable to the Committee would redress a threatened injury to the Committee. "An actual or threatened injury exists when a party's pecuniary interest may be affected by the outcome of a determination." *Id.* (citations

---

4. In its Amended Complaint, the Committee also claimed that the assignment constituted a fraudulent conveyance. A trial on the fraudulent conveyance issue has not yet been set. See Second Pretrial Order, "Trial Date."

omitted). The Committee asserts that the Debtor retains an interest in the portion of the Wrap Notes that the Partnerships claim they now own. If this court agrees with the Committee's assertion, the income from the purported assignment of a portion of the Wrap Notes would constitute property of the Debtor's estate pursuant to 11 U.S.C. 541. As such, this income might be available for distribution to the unsecured creditors. Thus, the outcome of this adversary proceeding may affect the pecuniary interest of the Committee.

 The Partnerships counter that the Bankruptcy Code does not empower the Committee to initiate an adversary proceeding, absent an unjustified failure by the debtor-in-possession to do so. Defendants' Brief at 6. The problem with this assertion, however, is that in 1993, the Debtor and the Committee entered into a stipulation allowing the Committee to pursue litigation on behalf of the Debtor's estate in which Long, the Debtor's president and majority shareholder, had a conflict of interest.

> The Creditors Committee and the Debtor have agreed that in those instances in which litigation needs to be pursued on behalf of the Estate of the Debtor, in all matters in which Mr. Long may have a conflict of interest, then the Creditors Committee, through its attorneys, Kramer Mellen, P.C., shall be deemed to have full authority and legal standing to pursue such litigation for the benefit of the Estate and its creditors.

Stipulation for Authority of the Creditors Committee to Pursue Litigation on Behalf of the Estate (the "Stipulation"), ¶ 6 at 2, Base Case Docket # 852. This court signed its Order Authorizing the Creditors Committee to Pursue Litigation on Behalf of the Estate on April 6, 1993. Base Case Docket # 853.

The adversary proceeding brought by the Committee raises a potential conflict of interest between the Debtor and Long. If this court, finds that the Debtor merely granted a security interest in the Wrap Notes and that the Partnerships did not properly perfect their security interest in those Wrap Notes, then the Partnerships' interest in the Wrap Notes may be avoided pursuant to 11 U.S.C.

§ 544. In consideration of the payments provided for by the terms of the Settlement Agreement, which included income from the assignment of a portion of the Wrap Notes to the Partnerships, the Partnerships released the Debtor from any further liability to the Partnerships stemming from the state court litigation by the Partnerships against the Debtor and Long. Joint Exhibit E, 110 at 12. However, Long guaranteed the Debtor's obligations to the Partnerships pursuant to the Settlement Agreement. "Upon the failure of [Debtor] to pay any amount, . . ., [Long] promises to pay all slams due from [Debtor] or perform [Debtor's] obligations under the Settlement Agreement on demand. . . ." Joint Exhibit G, ¶ 2 at 2. If the Partnerships do not receive the income stream from the Wrap Notes as a result of an adverse decision by this court as to the Partnerships' interest in those Notes, the Partnerships may make a claim against Long pursuant to the terms of the Personal Guarantee. Since Long's personal interest in the results of this adversary proceeding are potentially adverse to those of the Debtor's estate, the Committee has standing, pursuant to the terms of the Stipulation, to commence and pursue this adversary proceeding on behalf of the Debtor's estate.

## V. DISCUSSION

### A. *Admissability of Extrinsic Evidence*

The Committee argued at trial that the court should look beyond the four corners of the exhibits and consider parol evidence in order to ascertain the intent of the Debtor and the Partnerships when executing the Settlement Agreement and the Assignment. For the following reasons, the court rejects the Committee's assertion that the court should use extrinsic evidence offered at trial to determine whether the Debtor intended to assign an ownership interest or merely grant a security interest in the Wrap Notes to the Partnerships.

1. *Testimony Not Within the Scope of Parol Evidence Rule*

 At the outset, this court questions why the Committee even raises the parol

evidence rule in this adversary proceeding; the testimony offered simply does not fall within the scope of that rule. The parol evidence rule provides "that if the parties have stated the terms of their contract in the form of a complete written integration, it cannot be varied or contradicted by proof of *antecedent negotiations or agreements.*" ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 573 at 368 (1960) (emphasis added); *see In the Matter of Lansing Clarion Ltd. Partnership,* 132 B.R. at 849 (citations omitted); JOHN D. CALAMARI & JOSEPH M. PERILLO, CONTRACTS § 3–2 (3D ED.1987); RESTATEMENT (SECOND) OF CONTRACTS § 213 (1981). None of the Committee's three witnesses, however, testified about any *antecedent negotiations or agreements* between the Debtor and the Partnerships.

Kegler testified on two matters: (1) how the Debtor subsequently carried the Wrap Notes on its financial statements; and (2) whether the Debtor had any interest remaining in the Wrap Notes after payment to MNB and the Partnerships. The Committee offered Kegler's testimony and Joint Exhibit T, Stanaback & Company, P.C.'s ("Stanaback") Accountants' Review Report and Financial Statements for the years 1987 and 1988 ("Financial Statements"), to demonstrate that the Debtor believed it had transferred only a security interest in the Wrap Notes. Stanaback, however, completed its report on January 20, 1990. See Joint Exhibit T at 1. The parol evidence rule, absent certain exceptions, bars the introduction of *antecedent,* not *subsequent,* agreements between the parties. *See* Calamari and Perillo, *supra* § 3–2(a) at 136. This evidence certainly does not relate to an *agreement or negotiation* between the Debtor and the Partnerships; even if it did, it would be *subsequent* to the agreements in question, and the parol evidence rule would not bar its introduction.

As for Kegler's testimony that the Debtor retains a residual interest in the Wrap Notes *even* after paying off MNB and the Partnerships out of the Wrap Notes' income stream,

the court notes that, once again, the parol evidence rule simply does not apply to this testimony. The Committee did not offer oral or written evidence of prior negotiations or agreements between the Debtor and the Committee. Rather, it presented evidence to suggest that even after the assignment, the Debtor retained a residual interest in the Wrap Notes. The parol evidence rule does not preclude the introduction of this evidence. As with much of the Committee's proffered testimony, the problem is not whether the parol evidence rule bars the admission into evidence of this testimony, but whether the testimony is even marginally relevant to the issues litigated at trial.

The court notes that a similar analysis applies to the testimony of Zabriskie and Hansen. Both witnesses worked for MNB and both testified that MNB viewed its interest in the Wrap Notes as a security interest. Transcript at 89–90, 107–110. Neither testified as to any prior or contemporaneous agreements or negotiations between the Debtor and the Partnerships. Rather, both offered evidence about the agreements between the Debtor and a *third party,* MNB.

In conclusion, the evidence offered by the Committee does not fall within the scope of the parol evidence rule. Thus, that rule did not preclude the introduction at trial of Kegler's, Zabriskie's, or Hansen's testimony.

**2. *Committee's Testimony is not Relevant to the Issues***

The real obstacle the Committee faces with regard to the testimony offered at trial is not the parol evidence rule but the relevance of that testimony to the issues litigated at trial. The testimony and evidence offered by the Committee at trial either bore no relevance to the issues in this proceeding or actually contradicted the Committee's assertion that the Debtor merely had granted a security interest in the Wrap Notes to the Partnerships.[5] To understand the problems with the Committee's evidence, a brief recapitulation and explanation of the testimony of the Committee's three witnesses is in order.

---

**5.** It was the Committee's burden to produce relevant testimony on the issue of whether the Debtor merely had granted a security interest in the

Wrap Notes. The Committee had the burden of proof in this adversary proceeding. *See* Transcript at 24–25.

### a. *Kegler Testimony*

■ At trial, Kegler testified on two matters. First, he testified that even after paying off MNB's secured claim and the amounts owed to the Partnerships, the Debtor retained an interest in the Wrap Notes, ranging from $25,000 to $225,000 or $250,000. Transcript at 70–73. While this testimony answers the question of whether the Debtor has any interest in the Wrap Notes under § 541, it bears no relevance to the legal issue of whether the Debtor retains an interest in that portion of the Wrap Notes assigned to the Partnerships.

Second, in preparation for trial, Kegler prepared an analysis of the amounts that remained owing under the Wrap Notes. On cross-examination, Kegler stated that the Debtor carried the Wrap Notes as an account receivable on its books, but that the number on the books was *net* of the portion of the Wrap Notes assigned to the Partnerships. Transcript at 74.[6] On redirect, Kegler briefly testified as to the content of footnote 5 to the Financial Statements, which provided as follows:

> In 1983 the [Debtor] sold an apartment complex in exchange for two land contracts totaling $15,000,000.
>
> \* \* \* \* \* \*
>
> In December 1988, in settlement of the 1983 transaction, the [Debtor] assigned $2,800,000 of future wrap note proceeds to a partnership of which the majority shareholder is a partner. Wrap notes receivable are recorded at the net present value of the *unassigned balance.*

Joint Exhibit T at 7, n. 5 (emphasis supplied). This testimony and evidence contradict the Committee's assertion that the Debtor merely granted a security interest in the Wrap Notes to the Partnerships. If the Committee's assertion were true, then the Debtor would retain an ownership interest in the Wrap Notes, subject to a security interest. The Wrap Note receivable would then be carried on the books at full value, not net of the *assigned* portion of the Wrap Notes. After all, the Debtor granted MNB a security interest in these same Wrap Notes prior to preparation of the Financial Statements, yet the Debtor did not carry the Wrap Note receivable *net* of MNB's security interest. Transcript at 60.

### b. *Zabriskie and Hansen*

Zabriskie and Hansen worked for MNB during the period in which the Debtor entered into the Settlement Agreement and the Assignment. The court considers their testimony together because it suffers from the same relevancy problems.

■ Both witnesses testified as to MNB's interest in the Wrap Notes. Transcript at 89–90, 107–110. This testimony bears no relevance to the *Partnerships'* interest in those same Wrap Notes.[7] In addition, the court fails to see the relevance of the Committee's questions about MNB's release of its security interest in the Wrap Notes. Simply because MNB released a security interest rather than an ownership interest in the Wrap Notes does not mean that the Partnerships took only a security interest in the Wrap Notes. After all, the Debtor, *not MNB*, transferred its interest in the Wrap Notes. As the owner of those Wrap Notes at the time of the assignment, the Debtor could have partially assigned the Wrap Notes to the Partnerships, either subject to or not subject to another security interest, or merely granted the Partnerships a security interest in the Wrap Notes.[8] Za-

---

**6.** On voir dire examination by counsel for the Partnerships, Kegler testified as follows:

> "Q [By Sutton] All right. In terms of any of the receivable of the note that was assigned to [the Partnerships], you don't claim that [the Debtor] has any interest in that; do you?
> A [Kegler] We do not have it on our books shown as that. We do have a net number."
> Transcript at 60 (emphasis added).

**7.** The testimony by ex-employees of MNB does not show a course of dealing between the Debtor and the Partnerships. Cf. U.C.C. § 1–205(1). In addition, it does not demonstrate a usage of trade. *Cf.* U.C.C. § 1–205(2).

**8.** The Committee also seems to suggest that by providing for alternate amounts of future payment streams in the Assignment, dependent on whether the Debtor obtained a release from MNB of its security interest in the Wrap Notes, the Debtor could not possibly have intended to assign an ownership interest in the Wrap Notes. The court rejects any such suggestion. The Com-

briskie and Hansen's testimony as to *MNB's interest* in the Wrap Notes bears no relevance to the question of whether the Debtor assigned an ownership interest or granted a security interest in the Wrap Notes to the Partnerships.

### 3. Conclusion

None of the testimony offered at trial is materially relevant to the issues in this adversary proceeding. Accordingly, the court sees no reason to use the testimony to determine whether the Debtor actually assigned an ownership interest or merely granted a security interest in the Wrap Notes to the Partnerships. Because the documents submitted as Joint Exhibits are the only other evidence introduced at trial, this court examines those documents to determine the parties' intent. The exhibits relevant to the issue presented are the Assignment and the Settlement Agreement, and any documents incorporated by reference into the terms of the Assignment and the Settlement Agreement.

### B. Assignment or Security Interest?

 The court turns to Michigan law to assist it in determining whether the Debtor assigned an ownership interest or merely granted a security interest in the Wrap Notes. In *Allardyce v. Dart,* 291 Mich. 642, 289 N.W. 281 (1939), the Michigan Supreme Court provided an exhaustive explanation and definition of assignments.

In 4 Am.Jur. p. 229, an assignment in law is defined as "A transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one's whole interest in an estate, chattel, or other thing. It is the act by which one person transfers to another, or causes to vest in another, his right of property or interest therein."

The American Law Institute has defined an assignment of a right in its Restatement of the Law of Contracts, p. 171, § 149(1), as "A manifestation to another person by the owner of the right indicating his intention to transfer, without further action or manifestation of intention, the right to such other person or to a third person."

This court has defined the word "assignment" in the language of Webster as meaning "to transfer or make over to another;" and in the language of Burrill's Law Dictionary as "to make over or set over to another; to transfer." ' *Aultman, Miller & Co. v. Sloan,* 115 Mich. 151, 153, 73 N.W. 123.

*Id.* at 644–45, 289 N.W. 281. Thus, an assignment of property or of a contract right transfers ownership of the property or contract right assigned.[9] By comparison, a party granting a security interest in some collateral retains ownership of the collateral, subject to the security interest. The structure of the settlement transaction in this proceeding and a comparison to a typical secured transaction reveal that the Debtor assigned an ownership interest in the Wrap Notes to the Partnerships.

In a secured transaction, the debtor incurs a debt to a creditor. The debtor often agrees to pay off that debt over time, with certain payments made, often on an installment basis. The creditor may feel uneasy about the debtor's ability to pay and may request some collateral as security. The creditor only resorts to the collateral upon default, e.g., if the debtor fails to make payment as agreed. If the debtor completely pays off the loan, the creditor's right to the collateral is extinguished. Thus, in a typical

---

mittee fails to point to any case law that states that an assignor may not assign an ownership interest in property that is subject to an existing security interest. An assignee (the Partnerships) stands in the shoes of the assignor (the Debtor). *See Slater v. Ianni Construction Co.,* 268 Mich. 492, 494, 256 N.W. 495 (1934) (an assignee stands in the assignor's shoes). If the Debtor failed to obtain MNB's release, the Partnerships would have taken their partial ownership interest subject to MNB's existing security interest. The

court believes that this explains why the Partnerships required the Debtor to assign $500,000 more in payments to the Partnerships in the event that MNB failed to release its security interest in the Wrap Notes.

**9.** Contrary to the Committee's assertion, partial assignments are valid. *See* Restatement (Second) of Contracts § 326 (1981).

secured transaction, the creditor has the right to sell or dispose of the collateral upon the debtor's default on the underlying loan or obligation. *See* U.C.C. § 9-504.

By comparison, in this adversary proceeding, the Partnerships are paid directly *from* the so-called collateral. No default on the underlying obligation is needed to trigger payment under the Wrap Notes. In fact, the Debtor gave up all of its rights to a substantial portion of the payment stream from the Wrap Notes in consideration for the release and discharge of the underlying obligation— the state court judgment and any claims related to that lawsuit. *See* Joint Exhibit E, ¶ 10 at 12. The Debtor cannot possibly own that portion of the Wrap Notes assigned; it if did, full payment of the state court judgment by the Debtor would leave the so-called collateral untouched by the Partnerships. Upon satisfaction of the state court judgment, the Debtor would still own the assigned portion of the Wrap Notes and the payments made thereunder. The Committee's assertion essentially boils down to the following: the payments themselves are security for the payments themselves.

In addition, the language of both the Assignment and the Settlement Agreement simply do not support the Committee's assertion that the Debtor merely granted a security interest in the Wrap Notes. First, the Assignment states the Debtor's intention to transfer an *ownership interest* in the Wrap Notes.

> This Assignment is intended to be and for all intents and purposes shall be an Assignment of an Ownership interest in the Wrap Notes to [the Partnerships] as of the date of this Assignment. It is *not* intended to be an Assignment of a security interest in Exhibits A [ ($10.65 million Wrap Note) ] and B [ ($4.35 million Wrap Note) ] or the Wrap Notes.

Joint Exhibit F, ¶ 3 at 3 (emphasis in original). This language when coupled with the full title of the assignment document—Assignment of Ownership Interest in Wrap Note Payments—reveals an intent to convey an ownership interest in the Wrap Notes, not to grant a security interest in those Notes.

Second, the payment obligations incurred by the Debtor pursuant to the Settlement Agreement were undertaken in exchange for the Partnerships' release of the Debtor from any claim related to the state court litigation. If the Debtor defaulted on its payment obligations under the Settlement Agreement, did the Partnerships have recourse against the Debtor? Yes, they did because the Debtor provided security for the Settlement Agreement obligations in ¶ 3 of the Settlement Agreement, labelled "Security for Payments Required by [the Debtor]." Joint Exhibit E, ¶ 3 at 5. That security was not the payment stream from the Wrap Notes, but rather a guarantee from Long and an order creating a constructive trust, to be entered upon the Debtor's default of its Settlement Agreement obligations. *Id.*

## VI. CONCLUSION

Neither the structure of the settlement transaction nor the language of the relevant documents, in particular the Assignment and Settlement Agreement, supports the Committee's assertion that the Debtor granted a security interest in the Wrap Notes. Rather, the court holds that the Debtor assigned an ownership interest in a portion of the Wrap Notes to the Partnerships. As a result, however problematic, unless the Committee subsequently prevails on its fraudulent conveyance claim against the Partnerships, that portion of the Wrap Notes assigned to the Partnerships does not constitute property of the Debtor's estate. *See* 11 U.S.C. § 541(a)(3). Counts I and II of the Committee's Amended Complaint are dismissed. An order or judgment shall be entered accordingly at the conclusion of the fraudulent conveyance trial.[10]

---

10. Other counts remain outstanding and will be tried later. The court will therefore defer entry of an order or judgment to eliminate the possibility of a piccemeal appeal.